*372 ORDER (Granting Defendant’s Motion for Summary Judgment)
TODD R. MATHA, Associate Judge.
INTRODUCTION
The Court must determine whether to grant the defendant’s Motion for Summary Judgment. The Court examined the legal arguments proffered by both parties, but rules in favor of the defendant due to the absence of subject matter jurisdiction. The executive action at issue in the present case does not represent a source of law upon which a plaintiff may base a case or controversy.
PROCEDURAL HISTORY
The plaintiff, David Abangan, initiated the current action by filing a Complaint with the Court on January 16, 2001. Consequently, the Court issued a Summons accompanied by the above-mentioned Complaint on January 16, 2001, and delivered the documents by certified mail to the defendant’s representative, Ho-Chunk Nation Department of Justice (hereinafter DOJ).[1] One Mario Vargas affixed his signature to the Domestic Return Receipt. The Summons informed the defendant of the right to file an Answer within twenty (20) days of the issuance of the Summons pursuant to HCN R. Civ. P. 5(B). The Summons also cautioned the defendant that a default judgment could result from failure to file within the prescribed time period.
The defendant, by and through DOJ Attorney Michael Wacker, timely filed its Answer on January 25, 2001. The Court reacted by mailing Notice(s) of Hearing to the parties, informing them of the date, time and location of the Scheduling Conference. The Court convened the Scheduling Conference on February 12, 2001 at 3:00 p.m. CST. The following parties appeared at the Conference: David Abangan, plaintiff, and DOJ Attorney Michael Wacker, defendant’s counsel. The Court entered the Scheduling Order on February 14, 2001, setting forth the applicable time-line of the instant case.
On April 20, 2001, the defendant submitted the Defendant’s Notice and Motion to Dismiss accompanied by the Defendant’s Brief in Sup-port of Notice and, Motion to Dismiss (hereinafter Motion to Dismiss Brief). In response to these filings, the Court entered an April 26, 2001 Order (Motion Hearing), indicating that it would entertain oral arguments on the defendant’s motion at the scheduled Pre-trial Conference. The plaintiff filed the April 30, 2001 Response to Defend,ant’s Motion *373 to Dismiss in accordance with the HCN R. Civ. P. 19(A).
The Court convened the Pre-trial Conference on May 11, 2001 at 9:00 a.m. CDT. The following parties appeared at the Conference: David Abangan, plaintiff (by telephone), and DOJ Attorney Michael Wacker, defendant’s counsel. At the Pre-trial Conference, the parties agreed to resolve the instant case through summary judgment.[2] Id. at 3, 09:39:12 CDT. On May 25, 2001, the defendant filed its Motion for Summary Judgment and, Memorandum in Support Thereof (hereinafter Summary Judgment Memorandum ). The plaintiff declined to file the same, and likewise failed to submit a motion response.
Arguments presented in the defendant’s Motion for Summary Judgment prompted the Court to enter its August 1, 2001 Order (Requesting Attorney General Opinions). The defendant formally requested an extension on August 16, 2001, and the Court granted this request on August 21, 2001. The defendant filed two (2) Attorney General opinions on August 29, 2001, respectively designated as HCN Op. Att’y Gen. 09-28-01(1), 09-28-01(2)[3]
APPLICABLE LAW
CONSTITUTION OF THE HO-CHUNK NATION
Article III—Organization of the Government
Sec. 2. Branches of Government. The government of the Ho-Chunk Nation shall be composed of four (4) branches: General Council, Legislature, Executive, and Judiciary.
Sec. 3. Separation of Functions. No branch of the government shall exercise the powers or functions delegated to another branch.
Article IV—General Council
Sec. 1. Powers of the General Council. The People of the Ho-Chunk Nation hereby grant all inherent sovereign powers to the General Council. All eligible voters of the Ho-Chunk Nation are entitled to participate in General Council.
Sec. 2. Delegation of Authority. The General Council hereby authorizes the legislative branch to make laws and appropriate funds in accordance with Article V. The General Council hereby authorizes the executive branch to enforce the laws and administer funds in accordance with Article VI. The General Council hereby authorizes the judicial branch to interpret and apply the laws and Constitution of the Nation in accordance with Article VII.
Article V—Legislature
Sec. 2. Powers of the Legislature. The Legislature shall have the power:
(a) To make laws, including codes, ordinances, resolutions, and statutes;
Article VI—Executive
Sec. 2. Powers of the President. The President shall have the power:
(a) To execute and administer the laws of the Ho-Chunk Nation;
*374 .•(d) To administer all Departments, boards, and committees created by the Legislature;
U ) To execute, administer, and enforce the laws of the Ho-Chunk Nation necessary to exercise all powers delegated by the General Council and the Legislature, including but not limited to the foregoing list of powers.
Article Vil—Judiciary
Sec. 4. Powers of the Judiciary. The judicial power of the Ho-Chunk Nation shall be vested in the Judiciary. The Judiciary shall have the power to interpret and apply the Constitution and laws of the Ho-Chunk Nation.
Sec. 5. Jurisdiciimi of the Judiciary.
(a) The Trial Court shall have original jurisdiction over all cases and controversies, both criminal and civil, in law or in equity, arising under the Constitution, laws, customs and traditions of the Ho-Chunk Nation, including cases in which the Ho-Chunk Nation, or its officials and employees, shall be a party. Any such case or controversy arising within the jurisdiction of the Ho-Chunk Nation shall be fled in the Trial Court before it is filed in any other court. This grant of jurisdiction by the General Council shall not be construed to be a waiver of the Nation’s sovereign immunity.
Sec. 7. Powers of the Supreme Com1.
(c) Any decision of the Supreme Court shall be final.
HO.CHUNK NATION JUDICIARY ACT OF 1995
Sec. 2. Jurisdiction..
The Ho-Chunk Nation Judiciary shall exercise jurisdiction over all matters within the power and authority of the Ho-Chunk Nation including controversies arising out of the Constitution of the Ho-Chunk Nation; laws, statutes, ordinances, resolutions and codes enacted by the Legislature; and such other matters arising under enactments of the Legislature or the customs and traditions of the Ho-Chunk Nation. This jurisdiction extends over the Nation and its territory, persons who enter its territory, its members, and persons who interact with the Nation or its members wherever found.
DEPARTMENT OF BUSINESS ESTABLISHMENT AND ORGANIZATION ACT OF 1995
Sec. 5. Internal Organization.
(a) The Department of Business shall consist of four Divisions. Some of the Divisions (Gaming and Non-Gaming Business) will be comprised of individual enterprises.
(b) The Divisions shall be organized as follows (see attached organization chart):
1. Marketing
2. Administration
3. Gaming
4. Non-Gaming Business
HO-CHUNK NATION PERSONNEL POLICIES AND PROCEDURES MANUAL (updated Sept. 12, 2000)
Chapter 12 Employment Conduct, Discipline, and Administrative Review
General Conduct of Employees p. 42
An obligation rests with every employee of the HoChunk [sic ] Nation to render honest, efficient, and courteous performance of duties. Employees will therefore be responsible and held accountable for adhering to all Tribal policies, rules, directives, and procedures prescribed by the Nation through supervisory or management personnel.
Discipline Policy pp. 44-45
The intent of this policy is to openly communicate the Tribal standards of con *375 duct, particularly conduct considered undesirable, to all employees as a means of avoiding their occurrence. The illustrations of unacceptable conduct cited below are to provide specific and exemplary reasons for initiating disciplinary action, and to alert employees to the more commonplace types of employment conduct violations. No attempt has been made here to establish a complete list. Should there arise instances of unacceptable conduct not included in the following list, the Nation may initiate disciplinary action in accordance with policies and procedures.
B. Behavior
1. Willful or negligent violation of Personnel Policies and Procedures, unit operating rules, or related directives.
2. Failure to carry out a direct order from a superior, except where the order is illegal or the employee’s safety may reasonably be jeopardized by the order.
9. Conduct that interferes with the management of Tribal operations.
C. Performance
1. Inefficiency, incompetency, or negligence in the performance of duties, including failure to perform assigned tasks or training or failure to discharge duties in a prompt, competent, and reasonable manner.
Matters Covered by Administrative Review Syste/m p. 49
Eligible employees who have complaints, problems, concerns, or disputes with another employee, the nature of which causes a direct adverse effect upon the aggrieved employee, may initiate an administrative review according to establish procedures. Such matters must have to do with:
1. specific working conditions
2. safety
3. unfair treatment
4. disciplinary actions except verbal reprimands
5. compensation
6. involuntary termination
7. job classification
8. reassignment
9. any form of alleged discrimination
10. a claimed violation, misinterpretation, or inequitable application of these policies and procedures
Enterprise Employees Only p. 50a
The following Administrative Review Process is to be followed in seeking relief for all grievances. The burden of proof is on the grievant to show that what he/she is claiming, actually happened. All grievances will be courtesy copied to the Personnel Department promptly, by the grievant. This proof may include documentation and witness statements.
Level 1. A grievance will be submitted directly to the immediate supervisor and the Personnel Department within five (5) calendar days of the disciplinary action by the grievant. The supervisor will meet with the General/Facility Manager to discuss and investigate the grievance. Together, the supervisor and the General/Facility Manager will document and sign the response within ten GO) calendar days of receipt. The grievant will be notified of the response by certified mail with a courtesy copy sent to the Personnel Department.
Level 2. Within five days after the end of the previous deadline, and [sic ] appeal may be filed in writing to the Executive Director or his/her designee. The appeal may be submitted to level 2, if the grievant has not received a response to the grievance or has not reached an acceptable agreement in seeking to [s/c ] to the grievance. The Executive Director has fifteen *376 days for initial review and response; The response shall be sent to the appellant by certified mail with a courtesy copy sent to the Personnel Department.
CONFIRMATION PROCESS OF EXECUTIVE DIRECTORS FOR THE HO-CHUNK NATION ACT OF 19D(>
Sec. 403. The President, pursuant to Article VI, Section 2(e) of the Constitution of the Ho-Chunk Nation, must nominate all Executive Directors. Confirmation by the Legislature of a Nominee during a previous presidential administration shall have no force or effect in subsequent administrations nor in the event that an individual is reelected as President shall previous nominations or appointments remain in force or effect.
HO-CHUNK NATION STATUTE OF LIMITATIONS
Sec. 103. Statute of Limitations.
(b) All employment actions must be filed in the HCN Trial Court within 30 calendar days of the final decision of the Administrative Review process or the date such decision would have been due because of a failure to respond by the appropriate supervisor or director. If the injured employee does not initiate and timely file a complaint in the Trial Court, such claim and all claims arising from the incident shall be forever barred.
HO-CHUNK NATION RULES OF CIVIL PROCEDURE (adopted Feb. 22, 1997)
Rule 5. Notice of Service of Process.
(B) Summons. The Summons is the official notice to the party informing him/her that he/she is identified as a party to an action or is being sued, that an Answer is due in twenty (20) calendar days (See, HCN H. Cio. P. 6) and that a Default Judgement may be entered against them if they do not file &n Answer in the limited time. It shall also include the name and location of the Court, the case number, and the names of the parties. The Summons shall be issued by the Clerk of Court and shall be served with a copy of the filed complaint attached.
Rule 19. Filing and Responding to Motions.
(A) Motion. Motions may be filed by a party with any pleading or at any time after their first pleading has been filed. A copy of all written Motions shall be delivered or mailed to other parties at least five (5) calendar days before the time specified for a hearing on the Motion. A Response to a written Motion must be filed at least one day before the hearing. If no hearing is scheduled, the Response must be filed with the Court and served on the other parties within ten (10) calendar days of the date the Motion was filed. The party filing the Motion must file any Reply within three (3) calendar days.
Rule 27. The Nation as a Party.
(B) Civil Actions. When the Nation is filing a civil'suit, a writ of mandamus, or the Nation is named as a party, the Complaint, in the case of an official or employee being sued, should indicate whether the official or employee is being sued in his or her individual capacity. Service can be made on the Ho-Chunk Nation Department of Justice and will be considered proper unless otherwise indicated by these rules, successive rules of the Ho-Chunk Nation Court, or Ho-Chunk Nation Law. Rule 31. Required Disclosures.
(5) judicial notice shall be taken of and required disclosures shall be made of official documents, public documents, documents subject to public inspection, document and materials of non-executive session, governmental minutes and recordings of a governmental body pursuant to the HCN Open Meetings Act of 199(5.
*377 HO-CHUNK NATION RULES OF CIVIL PROCEDURE (amended Apr. 13, 2002)
Rule 58. Amendment to or Relief from Judgment or Order.
(A) Relief from Judgment. A Motion to Amend or for relief from judgment, including a request for a new trial shall be made within ten (10) calendar days of the filing of judgment. The Motion must be based on an error or irregularity which prevented a party from receiving a fair trial or a substantial legal error which affected the outcome of the action.
(B) Motion for Reconsideration. Upon motion of the Court or by motion of a party made not later than ten (10) calendar days after entry of judgment, the Court may amend its findings or conclusions or make additional findings or conclusions, amending the judgment accordingly. The motion may be made with a motion for a new trial. If the Court amends the judgment, the time for initiating an appeal commences upon entry of the amended judgment. If the Court denies a motion filed under this rule, the time for initiating an appeal from the judgment commences when the Court denies the motion on the record or when an order denying the motion is entered, whichever occurs first. If within thirty (30) days after the filing of such motion, and the Court does not decide a motion under this Rule or the judge does not sign an order denying the motion, the motion is considered denied. The time for initiating an appeal from judgment commences in accordance with the Rules of Appellate Procedure.
(C) Motion to Modify. After the time period in which to file a Motion to Amend of a Motion for Reconsideration has elapsed, a party may file & Motion to Modify with the Court. The Motion must be based upon new information that has come to the party’s attention that, if true, could have the effect of altering or modifying the judgment. Upon such motion, the Court may modify the judgment accordingly. If the Court modifies the judgment, the time for initiating an appeal commences when the Court denies the motion on the record, or when an order denying the motion is entered, whichever occurs first. If within thirty (30) calendar days after the filing of such motion, and the Court does not decide the motion or the judge does not sign an order denying the motion, the motion is considered denied. The time for initiating an appeal from judgment commences in accordance with the Rules of Appellate Procedure.
(D) Erratum Order or Reissuance of Judgment. Clerical errors in a court record, including the Judgment or Order, may be corrected by the Court at any time.
(E) Grounds for Relief. The Court may grant relief from judgments or orders on motion of a party made within a reasonable time for the following reasons: (1) newly discovered evidence which could not reasonably have been discovered in time to request a new trial; or (2) fraud, misrepresentation or serious misconduct of , another party to the action; or (3) good cause if the requesting party was not personally served in accordance with Rule 5(c)(l)(a)(i) or (ii); did not have proper service and did not appear in the action; or (4) the judgment has been satisfied, released, discharged or is without effect due to a judgment earlier in time.
Rule 61. Appeals.
Any final Judgment or Order of the Trial Court may be appealed to the Ho-Chunk Nation Supreme Court. The Appeal must comply with the Ho-Chunk Nation Rules of Appellate Procedure, specifically Rules of Appellate Procedure, Rule 7, Right of Appeal. All subsequent actions of *378 a final Judgment or Trial Court Order must follow the HCN Hulea of Appellate Procedure.
FINDINGS OF FACT
The parties stipulated that “no genuine issue as to material fact” exists within the instant case, thereby rendering the matter capable of resolution through summary judgment. HCN R. Civ. P. 55; see also Pre-Trial Conference (LPER at 3, 09:39:12 CDT); Summ. J. Mem. at 1-3. The following undisputed facts reflect common assertions of the parties and references to “documents subject to public inspection.” HCN R. Civ. P. 31(A)(5).
1. The plaintiff, David Abangan, is an enrolled member of the Ho-Chunk Nation, Tribal ID# 439A003956.
2. The defendant, Ho-Chunk Nation Department of Business, is an executive department administered by the Office of the President with principal offices located at the Ho-Chunk Nation Headquarters, W9814 Airport Road, P.O. Box 667, Black River Falls, WI. See Const., Art. VI, § 2(d). DeJope Bingo & Entertainment and Ho-Chunk Casino, Hotel & Convention Center are divisions within the Department of Business. Dep’t of Bus. Establishment & Org. Act of 1995, § 5(a-b).
3. Prior to August 1, 2000, the plaintiff was employed as a Marketing Director at DeJope Bingo at a rate of pay of $18.49 per hour. Shortly thereafter, the plaintiff was transferred to Promotions Manager at Ho-Chunk Casino at a rate of pay of $14.06 per hour. Summ. J. Memo, at 2. The transfer occurred in response to a marketing reorganization initiated by the former Executive Director of the Department of Business, F. William Johnson. Id. at 1-2.
4. On October 2, 2000, former Ho-Chunk Nation President, Jacob H. Lone-Tree, issued an executive order with the intent of reversing the marketing reorganization. Compl, Ex. 4. President Lone-Tree announced that the Department of Business “will suspend the implementation of Centralized Marketing until further notice. The marketing departments of Class II and III enterprises will revert to the organizational structures as they were pri- or to July 1, 2000.” Id. President Lone-Tree “expected [General Managers] to make appropriate status changes.” Id. Consequently, he authorized DeJope Bingo “to collect by reassignment, their original personnel/property from Ho-Chunk Casino Marketing,” but established no deadline for completion of this task. Id,
5. Neither DeJope Bingo nor Ho-Chunk Casino acted to restore the plaintiff to his position as Marketing Director at DeJope Bingo. Summ. J. Memo, at 3.
6. On December 26, 2000, the plaintiff submitted his Level I Grievance to the former Executive Director of the Department of Business, Silas Cleveland. Compl., Ex. 1. This submission occurred eighty-five (85) days after the issuance of the executive order. At such time, the plaintiff had no immediate supervisor, prompting him to combine the Level 1 and 2 Grievances. Id,, Ex. 5; see also Mot. to Dismiss Br. at 2.
7. Executive Director Cleveland never responded to the plaintiffs Level 1/2 Grievance within the statutorily allocated “fifteen days for initial review and response.” Ho-Chunk Nation Personnel Policies & Procedures Manual (Hereinafter Personnel Manual), Ch. 12 at 50a (emphasis added); see also Compl, Ex. 5.
8. The plaintiff filed the Complaint six (6) days after the timeframe elapsed for Executive Director Cleveland’s initial response.
*379 9. In a contemporaneous case, the Court recognized that “the question of how the succession after a President’s removal should work is an important question that needs to be answered in HCN Constitutional jurisprudence.” Clarence Pettibone, v. Robert Mudd et al., CV 01-17 (HCN Tr. Ct., May 16, 2001) at 8. The plaintiff initiated the suit while he occupied the Office of the President as President pro tempore. Id. at 4. The Court resolved the foregoing constitutional issue by “findfing] that a President pro tempore who merely acts as a caretaker of an administration until the next election is not a ‘subsequent administration’. ...” id. at 10. Neither party appealed the judgment entered in Pettibone.
DECISION
The Court must address a number of issues in the instant case, requiring discussion and analysis of several prior decisions of the Ho-Chunk Nation .Judiciary. In doing so, the Court will remark on the appropriate precedential value afforded to such decisions. The Court will direct its attention to the defenses raised in the Motion to Dismiss prior to resolving the central issue in dispute.
I. DID THE PLAINTIFF FILE HIS GRIEVANCE AND SUBSEQUENT COMPLAINT IN A TIMELY FASHION AS DICTATED BY THE PERSONNEL MANUAL AND THE HO-CHUNK NATION STATUTE OF LIMITATIONS?
The defendant charges that the plaintiff failed to properly grieve his cause of action in two (2) respects. First, the defendant contends that the plaintiff neglected to submit his initial administrative grievance “within five (5) calendar days of the disciplinary action.” Pees. Manual, Ch. 12 at 50a. The defendant urges the Court to utilize the date of the executive order as the beginning date for calculating the limitation periods. In other words, “[tjhe plaintiff had five (5) calendar days from the [sic ] October 2, 2000, the date the letter was sent by the President ..., to file his Level I grievance.” Mot. to Dismiss Br. at 2.
The Court recognizes that an employee may grieve conditions unrelated to supervisory discipline, and, therefore, does not interpret the above-quoted language as a limitation on grievances. See Pers. Manual, Ch. 12 at 49. The Court’s criticism of the defendant’s argument rests on its characterization of the executive order as the action that caused the plaintiffs alleged injury. Any injury would have resulted from non-adherence to the executive order, and not from the executive order itself. The plaintiff could not have filed a grievance on October 2, 2000, but the defendant would seemingly protest otherwise.
Agents within the Department of Business would have required a reasonable period of time to comply with the executive order, and the defendant surprisingly joins in this assessment. The defendant “argues vehemently that, on its face, the directive did not mandate or compel .. . DeJope Bingo and Entertainment to reassign Plaintiff.” Sunmi. J. Memo, at 9 (emphasis in original). Yet, while the defendant recognizes the need for subsequent administrative action, it portrays the executive order as possessing no coercive effect whatsoever. The defendant contends that the order merely imparted a degree of discretion to the DeJope Bingo General Manager, and that completion of reassignment was ultimately contingent upon future legislative action, hi. The defendant, however, disregards President LoneTree’s clearly stated expectation that General Managers “make appropriate status changes.” CornpL, Ex. 4. This di *380 rective did not hinge on any contingent events.
The plaintiff simply claims that he never received his status change. The non-receipt of the status change allegedly caused the plaintiffs injury, not the issuance of the executive order. Also, the plaintiff should not have reasonably anticipated a status change simultaneous or contemporaneous with the executive order. The plaintiff purportedly witnessed the reassignment of similarly situated individuals, but his transfer never transpired after waiting a reasonable period of time.
Twelve (12) weeks elapsed prior to the plaintiffs submission of the Level 1/2 Grievance. The Court does not deem that the plaintiff improperly exhausted his administrative remedies by waiting until December 26, 2000, to file his first grievance.[4] The executive order did not set a deadline for completion of appropriate status changes, but the Executive nonetheless protests on the grounds of an untimely filing. The Court shall refrain from automatically dismissing causes of action where the Ho-Chunk Nation, through action or inaction, introduces ambiguity into the grievance process. See e.g., Susan Bosgraaf v. HCN Sec. Dep’t, CV 01-01 (HCN Tr. Ct., Aug. 6, 2001) at 9.
Therefore, the Court holds that the plaintiff timely filed his initial administrative grievance. In arriving at this conclusion, the Court is instructed by relevant comments made in a recent opinion. Namely, “ ‘[a] limitations period does not begin to run until the plaintiff has a “complete and present cause of action.... ” A plaintiff must of necessity be capable of proving injury prior to the running of any statutory period.’ ” Daniel W. Green v. Real Estate Manager, Home Ownership Program,, in his official capacity, CV 00-108, 2002 WL 34432647, 4 Am. Tribal Law 362, 369 (HCN Tr. Ct., Dec. 31, 2002) at 12 (quoting Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal., 522 U.S. 192, 195, 118 S.Ct. 542, 139 L.Ed.2d 553 (1997) (internal citations omitted)). In the instant case, the plaintiff needed to hazard a guess as to when his injury became justiciable, and the Court will not turn the plaintiff away when the defendant erected the hazard.
The Second defense based on the issue of timeliness relates to the application of the Ho-Chunk Nation Statute of Limitations. The particular statute concerning employment actions should govern this matter. HCN Statute of Limitations, § 103(b). However, the Court has previously indicated that the statute does not properly interact with the Personnel Manual. Within Level 2 of the administrative review process, “the fifteen (15) day response deadline applies to initial decisions, and, therefore, the Ho-Chunk Nation Statute of Limitations reference to a presumed deadline has no application whatsoever.” Marie WhiteEagle v. Ho-Chunk Nation et al., CV 01-52 (HCN Tr. Ct., Sept. 21, 2001) at 10 n.8. The statute requires finality, but the underlying policy offers none. Pers. Manual, Ch. 12 at 50a.
The Court accordingly denied the Motion to Dismiss, holding that the plaintiff timely filed his pleading under the circumstances.[5] This determination, however, *381 merely permits the Court to examine the Complaint, and does not signify a ruling on the merits. The Court must next assess the continuing vitality of the executive order, and finally decide whether the plaintiff may invoke the executive order as a basis for subject matter jurisdiction.
II. DOES THE COURT’S EARLIER RULING THAT A PRO TEM-PORE ADMINISTRATION IS NOT A SUBSEQUENT PRESIDENTIAL ADMINISTRATION PRECLUDE THE DEFENDANT FROM ARGUING THAT THE EXECUTIVE ORDER BECAME INEFFECTIVE UPON THE VICE PRESIDENT ASSUMING THE OFFICE OF THE PRESIDENT?
On May 16, 2001, the Court ruled in an unrelated case that a Vice President’s temporary occupation of the Office of the President does not constitute a subsequent presidential administration. Pet-tibone, CV 01-17 at 10. The Court entered this ruling pursuant to its obligation to render constitutional interpretations* and, therefore, is presumed to have broad application. Regardless, the defendant contended only nine (9) days later that the same pro tempore administration represented a subsequent administration. Summ. J. Memo, at 9. The defendant presented this argument in an effort to challenge the continuity of the executive order. The defendant did so without even mentioning the above case.
The Attorney General later emphasized the factual differences in the two (2) cases in an attempt to erect a justification for defense counsel’s failure to at least cite the previous decision. HCN Op. Att’y Gen. 09-28-01(1) at 1-4. The Attorney General also argued that the two (2) positions were not truly contradictory. Id. The Court, however, does not join in this conclusion.
While the contexts of the cases differ, the Court offered a constitutional interpretation within the Pettibone decision, and it will not depart from this interpretation absent strong arguments to the contrary. As previously indicated, the defendant made no argument, but the Attorney General did propose the following argument after the fact.
Mr. Wacker’s argument does not completely contradict the earlier argument by [former Attorney General] Gary Brownell. Mr. Wacker is arguing that when President Pro Tempore Pettibone took office that it was a new administration in general. Gary Brownell argued that when Clarence Pettibone took office it should not be considered a “subsequent administration,” but only as defined by the Confirmation Act. Gary Brownell’s brief in support of this position, however, notes that although not a “subsequent administration” it is technically a new administration. Brownell argues that the President Pro Tempore serves a very limited term and does not take on the responsibility to form a new administration and may accept the Executive as he or she finds it. Brownell further adds that the President Pro Tempore does have the powers to discharge Executive Directors and nominate successors. If the President Pro Tempore exercises this power he or she is in a sense forming a new administration.
Id. at 3 (internal citations omitted).
Unfortunately, the Attorney General’s depiction overlooks the fact that the defen *382 dant utilized the adjectives: “new” and “subsequent” interchangeably, as if synonyms. Summ. J. Memo, at 9. Also, in Pettibone, the Court avoided ruling a statutory provision unconstitutional by defining the legal status of a pro tempore administration. Pettibone, CV. 01-17 at 10; see also Confirmation Process of Executive Dir. for the HCN Act of 1996, § 403. The Court plainly explained its logic in reaching this determination. The Court reasoned “that an administration is one that is constituted after an election. That is the ordinary construction given administration in all other contexts.” Id. at 8. In the context then at issue,
after a removal, the Vice President, now the President pro tempore, is a caretaker who shepards [sic ] the administration crippled by the loss of its head until the next Election occurs and a new President is chosen by the electorate. A President pro tempore is always a Legislator elected from just one district and has no mandate, plan or vision validated by the entire electorate. He/she is merely a caretaker.
Id. at 10. Given this understanding, the Court construes the Attorney General’s analysis as one based on semantics and not true legal distinctions.
The Court, therefore, concludes that the defendant’s position stands in clear contradiction to the ruling in Pettibone. The Court must next determine the prece-dential effect of the prior decision. The Ho-Chunk Nation Supreme Court (hereinafter Supreme Court) confirmed that pursuant to the Constitution of the Ho-Chunk Nation (hereinafter Constitution), Supreme Court decisions “are binding on the Trial Court.” Jacob LoneTree et al. v. Robert Funmaker, Jr. et al., SU 00-16 (HCN Tr. Ct., Mar. 16, 2001) at 4 (citing Const,, Art. VII, § 7(c)). The Supreme Court continued, indicating that “[w]hile the [Tjrial [C]ourt should try to remain consistent in its decisions, only decisions by this court are limitations on the Trial Court.” Id.
The Supreme Court essentially reiterated the jurisprudential doctrine commonly referred to as stare decisis. See HCN Election Bd. v. Robert Mudd., SU 97-05 (HCN S.Ct., Oct. 28, 1997) at 2; see also Planned Parenthood of SE Pa. v. Casey, 505 C.S. 833, 854-69, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). The Supreme Court earlier explained that “/s/fore decisis is the policy of courts to stand by prior established precedent.” Mudd at 2. The Trial Court must observe binding precedent of the Supreme Court. Only the Supreme Court can chose to overrule or depart from one of its prior constitutional renderings, and, even then, only when confronted with an extraordinary change in circumstances. Id.; see also Planned Parenthood, 505 U.S. at 854-55, 112 S.Ct. 2791. “[A] decision to overrule should rest on some special reason over and above the belief that a prior case was wrongly decided.” Planned, Parenthood, 505 U.S. at 864, 112 S.Ct. 2791.
Concerning the instant case, neither party appealed the Pettibone decision, yet other judicial rules of preclusion may serve to impart binding effect to the ruling. First, “[u]nder res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.” Allen v. McCurry, 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980) (citing Cromwell v. County of Sac. 94 U.S. 351, 352, 24 L.Ed. 195 (1876)). The Court previously utilized this principle when it dismissed a cause of action that proceeded to final judgment within the courts of the State of Wisconsin. C & B Inv. v. HCN Dep’t of Health et al., CV 96-06 (HCN Tr. Ct., Nov. 21, 1996) at *383 10-14. The Court performed a conventional analysis of the accepted tenets of the res judicata doctrine in affording preclu-sive effect to a Wisconsin Supreme Court decision. Id. The doctrine, however, has no application in the present scenario since it requires mutuality of the parties. Since the plaintiff did not participate in the Pet-tibone case, the Court cannot automatically preclude the contrary argument now posed by the defendant.
The doctrine of collateral estop-pel represents another generally accepted rule of judicial preclusion. “Under the judicially developed doctrine of collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision is conclusive in a subsequent suit based on a different cause of action involving a party to the prior litigation.” United States v. Mendoza, 464 U.S. 154, 158, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984) (citing Montana v. United States, 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979)). Both “res judicata and collateral estoppel relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication.” Allen, 449 U.S. at 94, 101 S.Ct. 411 (citing Montana, 440 U.S. at 153-54, 99 S.Ct. 970).
Even so, a court may not logically apply collateral estoppel against a party that prevailed in an earlier action. Why? A plaintiff may not appeal a favorable judgment in which he or she disputes certain findings of fact or conclusions of law. See Lona, Decorah v. Ho-Chunk Nation, PRC 93-40 (HCN S.Ct., Feb. 22, 1996). Also, a plaintiff that fully agrees with a favorable judgment would have no reason to appeal. Consequently, if the defendant chooses not to file an appeal, then the disputed issue(s) never receive appellate scrutiny, and future unrelated defendants should not be bound by the outcome of a case in which they did not participate.
 On the other hand, a losing plaintiff would possess the ability to initiate an appeal, and a failure to do so would indicate acquiescence to the lower court judgment. Even if other factors informed the plaintiffs decision to forego an appeal, the plaintiff nevertheless maintained the opportunity. Collateral estoppel applies in this instance.
Offensive use of collateral estoppel occurs when a plaintiff seeks to foreclose a defendant from relitigating an issue the defendant has previously litigated unsuccessfully in another action against the same or a different party. Defensive use of collateral estoppel occurs when a defendant seeks to prevent a plaintiff from relitigating an issue the plaintiff has previously litigated unsuccessfully in another action against the same or a different party.
Mendoza, 464 U.S. at 159, 104 S.Ct. 568 (citing Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322, 326 n. 4, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979)).
In the instant case, the common party in the two (2) cases prevailed at the trial level in the first action. Collateral estoppel, therefore, does not apply, and the Court is left only with the prudential direction of the Supreme Court: “try to remain consistent.” LoneTree, SU 00-16 at 4. The Court shall not depart from the Pet tibone, ruling since the defendant presented no persuasive arguments to the contrary. The Court should reasonably expect that litigants attempt to distinguish or analogize prior lower court decisions, even if such decisions do not possess preclusive authority.
The Court accordingly holds that the executive order remained in full force and effect following the Vice President’s eleva *384 tion to President pro tempore, absent any explicit revocation of the order by the administration. The Court declines to offer an opinion regarding the extent to which an executive order survives a transition into a subsequent administration since not presented by this case. This holding, however, does not answer the question of whether the plaintiff may base a cause of action on an executive order.
III. DOES THE PLAINTIFF’S CAUSE OF ACTION DERIVE FROM A SOURCE OF LAW OVER WHICH THE COURT MAY PERMISSIBLY EXERCISE SUBJECT MATTER JURISDICTION?
The Court derives its powers through a delegation of authority from the General Council. Const. Arts. Ill, § 2, IV, §§ 1-2. Specifically, the Court is charged with interpreting and applying the Constitution and laws of the Ho-Chunk Nation. Id., Arts. IV, § 2, VII, § 4. In this regard, the Ho-Chunk Nation Judiciary has endeavored to provide litigants guidance concerning the constitutional limitations of the Court’s subject matter jurisdiction. See Ho-Chunk Nation v. Harry Steindorf et al., CV 99-82 (HCN Tr. Ct., Feb. 11, 2000), aff'd, SU 00-04 (HCN S.Ct., Sept. 29, 2000).
The Court may assert subject matter jurisdiction “over all cases and controversies ... arising under the Constitution, laws, customs and traditions of the Ho-Chunk Nation.” Const., Art. VII, § 5(a); see also HCN Judiciary Act of 1995, § 2. The Supreme Court has determined that a litigant cannot maintain a case or controversy within the Judiciary if the constituent causes of action arise outside the explicit jurisdictional grant. Steindorf, SU 00-04 at 2-5. “A controversy is ‘the thing in dispute’; a dispute of law that grants the HCN courts subject matter jurisdiction. A dispute in law in which the HCN Trial Court can apply.” Id. at 3. If the dispute or cause of action does not arise from “the Constitution, laws, customs [or] traditions of the Ho-Chunk Nation” in the first instance, then the Court lacks subject matter jurisdiction to hear the claim. Const., Art. VII, § 5(a).
The plaintiff purports to allege a violation of law, namely the executive order. The President, however, may only “execute and administer the laws of , the Ho-Chunk Nation,” including the “administfration of] all Departments, boards, and committees created by the Legislature.” Id., Art. VI, § 2(a, d). The exercise of presidential powers presupposes the existence of enabling legislation; legislation that must derive from the exercise of legislative powers. The Constitution imparts sole authority “[tjo make laws” to the Ho-Chunk Nation Legislature, but it can delegate this authority to the President. Id., Arts. V, § 2(a), VI, § 2(1). The Court has recognized explicit delegations of lawmaking powers in the past. See e.g., HCN Hous. Auth. v. Cont’l Flooring Co., CV 01-76 (HCN Tr. Ct., Feb. 19, 2002) at 7-8.
Consequently, “[t]he binding nature of [an executive [o]rder is limited to the Executive’s authority to issue such an order....” Jean Day et al. v. HCN Pers. Dept, CV 96-15 (HCN Tr. Ct., Aug. 21, 1996) at 5. The President’s capacity to execute laws does not extend so far as to permit the promulgation of laws. “ ‘The duty of the President to see that the laws be faithfully executed is a duty that does not go beyond the laws or require him [or her] to achieve more than [the legislative branch] sees fit to leave within his [or her] *385 power.’ [6] Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 610, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Frankfurter, J., concurring) (quoting Myers v. United States, 272 U.S. 52, 177, 47 S.Ct. 21, 71 L.Ed. 160 (1926)). The Court, therefore, must discern a legislative delegation of power supporting the executive order.
The Court directs its attention to the Personnel Manual in order to locate a possible delegation. In the discipline policy section, the Legislature designates a failure to abide by supervisory directives as unacceptable conduct. Pers. Manual, Ch. 12 at 44-45. The Legislature assumes the existence of and ability to pronounce directives, but does not imbue upon these pronouncements the force of law. Moreover, the Personnel Manual provides a mechanism for initiating discipline against a subordinate who neglects to execute a directive, but does not create a cause of action for the intended subjects of such a directive. Id. The plaintiff finds himself in this latter category. Also, the Personnel Manual does not distinguish amongst supervisory directives, meaning that the provisions could refer to executive orders as well as, for example, a directive from a Slot Shift Supervisor. The Court cannot elevate either directive to the status of law, and no conceivable rationale exists for treating the two (2) directives differently. The clear language of the Personnel Manual does not support an alternative interpretation.
Based upon the foregoing, the Court holds that it lacks subject matter jurisdiction over the case at bar. The plaintiff failed to present any argument, persuasive or otherwise, to the contrary. The Court, therefore, grants the defendant’s Motion for Summary Judgment.
The parties retain the right to file a timely post judgment motion with this Court in accordance with HCN R. Civ. P. 58, Amendment to or Relief from Judgment or Order. Otherwise, “[a]ny final Judgment or Order of the Trial Court may be appealed to the Ho-Chunk Nation Supreme Court.[7] The Appeal must comply *386 with the Ho-Ghunk Nation Rules of Appellate Procedure [hereinafter HCN R.App. /’,], specifically [HCN R.App. P.\, Rule 7, Right of Appeal.” HCN R. Cio. P. 61. The appellant “shall within thirty (30) calendar days after the day such judgment or order was rendered, file with the [Supreme Court] Clerk of Court, a Notice of Appeal from such judgment or order, together with a filing fee of thirty-five dollars ($35 U.S.).” HCN R.App. P. 7(b)(1). “All subsequent actions of a final Judgment or Trial Court Order must follow the I//C.Y R.App. /'.J.” HCN R. Cio. P. 61.
IT IS SO ORDERED this 25lh day of March 2003, by the Ho-Chunk Nation Trial Court located in Black River flails, WI within the sovereign lands of the Ho-Chunk Nation.

. The Ho-Chunk Nation Rules of Civil Procedure (hereinafter HCN R. Civ. P.) permit the Court to serve the Complaint upon the DOJ when the plaintiff/petitioner names as a party either a unit of government or enterprise oí-an official or employee being sued in their official or individual capacity. HCN R. Civ. P. 27(B).

. The Court denied the defendant’s motion to dismiss from the bench. Pre-Trial Conference (LPER at 3, May 11, 2001, 09:34:50 CDT). Due to the relative importance of the involved issues, the Court memorializes this decision below.

. The Court recognizes that over eighteen (18) months have elapsed since the parties' last filings. During this timeframe, the Court experienced great uncertainty concerning the retention of judicial officers: resulting in dramatic shifts in workload. In addition, the Court needed to perform its constitutional analysis without the benefit of any well-structured argument presented by the plaintiff. See Resp. to Def.’s Mot. to Dismiss at 2.

. Likewise, the Court does not fault the plaintiff for combining his Level 1 and 2 Grievances since no individual occupied the role of immediate supervisor during the time in question. Pers. Manual, Ch. 12 at 50a, .

. The Court also denied the defendant's assertion that the plaintiff failed to name an indispensable party, the Ho-Chunk Nation, and consequently cannot maintain a suit for money damages. Mot. to Dismiss Br. at 4. The Court has repeatedly rejected this delense in the past, and declines to reiterate die perti *381 nent analysis here. See e.g., Patrick O'Leary v. Ho-Chunk Casino (Slots Floor Dep't), CV 00-28 (HCN Tr. Ct., Sept. 6, 2000) at 2-3.

. The Court appreciates the requested cooperation of the Attorney General in providing official opinions of her office. The Court must note that the Attorney General's reliance on a law review in which the author reveals an ultra-conservative agenda serves to greatly detract from the authoritativeness of the second opinion. HCN Op. Att'y Gen. 09-28-01(2) (citing John A. Sterling, Above the Law: Evolution of Executive Orders, 31 UWLA L.Rev. 123 (2000)). Adjunct Professor Sterling, Tidewater Community College, likens President William J. Clinton's policy choices to that of Adolf Hitler, and suggests that “[wjithout the internal constraints placed upon our conscience by the Spirit of God, and the constraining external influence of good government, it is a virtual certainty that power will consolidate in the hands of few [siej evil men.” 31 UWLA L.Rev. at 130, 134. Needless to say, the Court placed no stock in the proffered law review.

. The Supreme Court earlier emphasized that it “is not bound by the federal or state laws as to standards of review.” Louella A. Kelty v. Jonette Pettibone et al., SU 99-02 (HCN S.Ct., Sept. 24, 1999) at 2. The Supreme Court, therefore, has voluntarily adopted an abuse of discretion standard "to determine if an error of law was made by the lower court.” Daniel Youngthunder, Sr. v. Jonette Pettibone et al., SU 00-05 (HCN S.Ct., July 28, 2000) at 2; see also Coalition for a Fair Gov’t II v. Chloris A. Lowe, Jr. et al., SU 96-02 (HCN S.Ct., July 1, 1996) at 7-8; and JoAnn Jones v. HCN Election Bd. et al., CV 95-05 (HCN S.Ct., Aug. 15, 1995) at 3. The Supreme Court accepted the following definition of abuse of discretion: "any unreasonable, unconscionable and arbitrary action taken without proper consideration of facts and law pertaining to the matter submitted.” Youngthunder, Sr., SU 00-05 at 2 (quoting Black's Law Dictionary 11 (6th ed. 1990)). Regarding findings of fact, the Supreme Court has required an appellant to "demonstrate! ] clear error with respect to the factual findings of the trial court.” Coalition II, SU 96-02 at 8; but see Anna Rae Funmak *386 er v. Kathryn Doornbos, SU 96-12 (HCN S.Ct., Mar. 25, 1997) at 1-2.